The last case for argument this morning is 17-1852, District of Minnesota, Daniel Ayala v. CyberPower Systems. Good morning, Your Honors, and may it please the Court, I am Dwight Ravis of the DeWitt Macon-Crownston Moore Law Firm here today for Appellant and Plaintiff Daniel Ayala. To get ahead of ourselves just a bit, should Mr. Ayala be fortunate enough to prevail on a remand trial of his case, he will be happy to accept damages in the form of checks, currency with God we trust on it, bitcoin or any other form. The case before the Court raises a question of statutory construction governed by Minnesota law. As our briefing indicates to you, Mr. Ayala was the youngest of a nine-children family in Mexico City, had a successful career abroad, came to the United States some years ago, became a United States citizen, had a highly successful career at other power supply companies before joining Respondent CyberPower in 2006. He was at the outset indisputably an employee at will, as the company handbook and his employment agreements signed at the time indicated. Those same agreements, however, provided a specific process for how he and the company could undertake to change his employment status from at will to an employment for a defined term. As the record indisputably indicates, that process was followed particularly and exactly during the negotiations culminating in the contract Mr. Ayala and CyberPower entered in 2012. It's the construction of that contract, which is at issue here, and the question before the Court, of course, is would it be possible for any trier of fact to construe the contract as Mr. Ayala proposes? That question has thus far been entertained by three different federal judges, Magistrate Judge Franklin Noel, then Chief Justice Davis, and most recently Judge Doty. And two of those three judges have concluded that the contract is in fact ambiguous and must ultimately be interpreted by the trier of fact. In his opinion, and that's what we're here about today, Judge Doty obviously reached a contrary conclusion, and we respectfully propose that the conclusion he reached ignores the clear position of Minnesota's courts as to how parties may change an employee's status from at will to that for a defined term, as well as to overlook parole evidence developed in the record, which at trial would lead a reasonable jury to conclude that Mr. Ayala is in fact right. If you were setting this up as a jury trial, how would the court instruct the jury? What would the court instruct the jury? They say, here's the language, is that language susceptible to two different interpretations, and if so, which one? Is that how you would do that? Well, yes, Judge Beam, of course, the question of whether or not the contract is ambiguous or not is a question of law to determine by the court. We believe that under de novo review, your conclusion should be that it is ambiguous, and then at trial, the jury would be properly charged. That's the key question. Yes, the jury should be charged to make a determination based on the documents and testimony it would receive and the evaluation of that testimony, to conclude whether or not the parties had agreed, in fact, to change the employment status of Mr. Ayala to persist through a time where company sales reach $150 million a year. We think there is one Minnesota case standing prominently in favor of our position, which is close to controlling of the circumstances of the case here, and that's the Kivadar case from some years back, which is very parallel to what we have here. In that case, a gentleman went to work for the defendant, rotation engineering. He was initially an employee at will, and after that employment relationship began, the employer presented him with a simple one-page document characterized as a compensation agreement, which provided a specific rate of compensation, gave him a title, described his responsibilities, and talked about the compensation plan he would receive through a defined future point. The company terminated him before that defined future point was reached. Mr. Kivadar sued the company. The company defended, as CyberPower does here, on the basis that the plaintiff had always remained an at-will employee because the contract entered between the parties was, in fact, not a contract adequate to change the employment status. The court in that case rejected the proposition. It looked to the fact that, notwithstanding the fact it described compensation, that it did affect the conditions of employment, and the court, looking back to other Minnesota cases preceding the decision it made, pointed out that under Minnesota law, it is not all that difficult for someone to be moved from at-will status to employment for a defined term. That can be done through a written agreement. It can be done through an oral agreement. The courts of Minnesota in Rogline and Poff and other cases have said, in fact, that if an employer tells an employee, you have a job here as long as you do a good job, or you have a job here as long as you don't abuse our customers, that that is sufficient to establish or at least create a tribal issue of fact as to whether or not you have a contract for a defined term. Here, of course, we have something far stronger. We have a written agreement signed both by Mr. Ayala and the two highest officials at CyberPower, Love of the Father and Love of the Son, which provides in Article 7, which is entitled, by the way, Employment Terms, that the compensation plan set out in the contract is to remain in place until company sales reach $150 million. So we do, in fact, have evidence of an intent to change, which is in writing. The contract was entered precisely in the manner set out in the initial employment agreements between Mr. Ayala and the company, and we think that from a jury could easily conclude that his employment status was, in fact, modified. If the company went out of business, how will you be compensated for that $150 million goal? Well, Mr. Ayala, in that circumstance, Judge Bean would find himself, I suppose, situated as would an employee or an executive with any number of companies. Isn't that Will Employee? Well, he would have, I suppose, a claim in the bankruptcy proceeding based on the contract. The claim he would put into the bankruptcy court would be- I didn't say go bankrupt. I said just went out of business and closed the doors. Where do we get the-you get your claim in a bankruptcy proceeding or what? Well, if the company just closed its doors, Your Honor, I can say only that Mr. Ayala would be up against it. It's difficult to pursue a plaintiff, assuming a defendant, which ceases to exist, I suppose, in that circumstance. We would be exploring issues we haven't looked at here, alter egos, successors in interest, and the like. In this particular case, Cyber Power USA is owned by a large overseas conglomerate of similar name, and I would think that would have prompted some litigation involving the parent company. But how would you determine when sales would reach $150 million under that circumstance? I would think in that circumstance, Your Honor, you would look to the business portfolio discharged by the company here and where that portfolio went. There are, of course, impossibility defenses that can be raised if something is bombed out of existence or otherwise. I mean, sometimes you find yourself without a defendant to pursue. That's clearly not the case here. All right, I don't think you've addressed the elephant in the room, which is, of course, the statement that this is not an employment contract. Well, paragraph 7 of the agreement says this is not a multi-year agreement or employment contract for either party. And we think that language literally can be understood in the way that Magistrate Judge Noel and Judge Davis read it to me. In other words, the parties are not defining their relationship in terms of the calendar. This is not a multi-year agreement such that they're agreeing to an employment and compensation relationship of three, four, or five years. They are instead defining the relationship based on the occurrence of a condition subsequent. And that, of course, is accomplished in contracts all the time. Mr. Ayala's understanding certainly in his testimony at trial would be that that language was there, and there's no comma. We discussed the punctuation importance in the brief. Because the mutual objective of he and Mr. Lovett was that he discharge a mission, that he captain the VAR market within cyber power until such time that that target was reached. More than that, the record is clear that both Mr. Ayala and Mr. Lovett had a common expectation of when that would be. Mr. Lovett testified in deposition that he trusted the business forecast made by Mr. Ayala. He read them, and they all expected that target to be reached in approximately eight years. Discovery, by the way, has indicated that notwithstanding Mr. Ayala's departure, the company is, in fact, on target to reach the $150 million mark in about eight years from when the contract was made, that being next year. As to the parole evidence that a jury would consider, and I speak to this because Judge Doty, in addition to talking about ambiguity, also said, well, the parole evidence would require a jury to find for the defendant. We think it's quite to the contrary. When the company was moving in the direction of discharging Mr. Ayala, the path was interesting. Notwithstanding the fact that they now take the position in the litigation, that the contract actually meant nothing, that it imposed absolutely no obligations upon them, and that they remained free even two minutes after it was signed to fire him, change his compensation, change his title. In late 2014, the company sought to affect those changes by presenting Mr. Ayala with a new detailed written contract, which would change his compensation, change his title, and significantly reintroduce into the employment relationship a specific provision that he was now again an employee at will. He refused to sign that because he didn't want to reduce his comp. He didn't want to return to at will status. And the record here is undisputed that the company fired him solely because he would not sign the new contract. So I would expect what happened here is the company knew it had a contract. They were counseled that they needed a replacement contract with more favorable company terms. When they couldn't get it, they did what we saw happen here. So we think, and basically I find myself in the unusual position here as an appellant of endorsing the position of a couple of judges at the district court, while respectfully disagreeing with that of another one. We think the analysis offered in this instance by the judges who entertained the motion to dismiss is better, more comprehensive, more persuasive than that undertaken by Judge Doty. But as we try to explain in the briefs as well, there is abundant evidence in the record that would allow a jury at trial to construe the contract in the manner we proposed. And that is significantly the conduct of the party in the closing days of the relationship. But it is also, in part, manifested in the briefs placed before the court by CyberPower, where they acknowledge that prior to the time the contract was made, the other things the parties had talked about, more money, a bonus structure and the like, had been affected by fiat. And so the only issue on the table was job security. Mr. Ayala's clearly expressed interest that the benefits he was getting he wanted secured and in place for some period of time. And that was the only possible purpose for the parties to move to the creation of the written contract. And they did. Judges Noel and Davis, correctly, we think, point out that- Mr. Rabuse, I see you're well into your rebuttal. And I would like to reserve the last minute, Your Honor. Thank you. Thank you very much, and good night. I'll just stand tall. Good morning. May it please the court, counsel. My name is Amy Conway. I am with the law firm of Stinson Leonard Street. And I am here today on behalf of the appellee, CyberPower Systems USA. We are respectfully asking the court today to affirm the district court's order granting CyberPower's summary judgment on appellant's breach of contract, fraud and unpaid wages claims. Your Honor, the district court correctly found that appellant's reading of the compensation agreement fails as a matter of law. The district court correctly rejected appellant's claim that this one-page compensation agreement, which was drafted by a non-lawyer, repeatedly describes itself as a compensation agreement. And, in fact, as Your Honor pointed out, says that it is not an employment contract, somehow alters the strong presumption of at-will employment under Minnesota law. Now, this argument ignores the undisputed facts of this case and settled Minnesota case law. As a factual matter, it's undisputed that appellant drafted this compensation agreement. That was not the case at the motion-to-dismiss stage, by the way, because the amended complaint says CyberPower drafted the agreement. That was found to be untrue in discovery. And the compensation agreement also says that paragraph 7 of the compensation agreement, which is where the language saying it's not an employment contract, was inserted by appellant after CyberPower's then-president, Robert Lovett, said in an email that I'll discuss in the record, that he had issues signing a long employment agreement and effectively didn't want to do so. Appellant's materials omit the fact that appellant then responded to that email from Robert Lovett by saying, essentially, hey, don't worry about it, this agreement is, quote, for compensation purposes, and by adding this paragraph 7. As a legal matter, Minnesota law requires that if parties want to overcome the presumption of at-will employment, that they say so in clear and unequivocal terms. The compensation agreement lacks this language, and, therefore, the district court correctly concluded that CyberPower did not breach this agreement as a matter of law when it terminated appellant's employment. Who drafted paragraph 7? That was appellant, Your Honor. What the chronology effectively was, the parties were negotiating appellant's compensation. Both appellant and Robert Lovett testified that they had had many changes in his compensation and, specifically, his commission throughout his employment. Appellant was sick of having to renegotiate it. Robert Lovett was sick of having to renegotiate it. And so appellant put together a version of the compensation agreement that lacked paragraph 7. He sent that to Robert Lovett on October, I believe, 22nd of 2012. On October 28th of 2012, Robert Lovett responds to the email from appellant that had attached the version of the compensation agreement without paragraph 7. And this is in CyberPower's addendum 1 through 4. Those are where you can find these emails from October 28th and 29th. But CyberPower's then president, Robert Lovett, says, I have issues signing such a long employment contract. This is going to need to be run past our lawyers and outside accountants. The very next day, appellant responds to that email and says, I added paragraph 7. This agreement is for compensation purposes and by no means a multiyear agreement. That addition of paragraph 7, then, that's the final version of the agreement that the parties ultimately executed. So that gets a little bit into the parole evidence argument. But I believe that the district court's order should be affirmed either way, whether this court finds the compensation agreement ambiguous or unambiguous. And the district court did find it's unambiguous. But even if it were ambiguous, summary judgment is appropriate when the parole evidence is considered. So first on the point that the compensation agreement is unambiguous, Your Honors, under Minnesota law, again, in order to alter the presumption of at-will employment, there needs to be clear and unequivocal language by the parties evidencing their intent to do so. So that, of course, begs the question, okay, where's the clear and unequivocal language that says your employment is guaranteed for some period of time? And if we look at the compensation agreement, appellant has never been able to point to this clear and unequivocal language because it's simply not there. The title of the document is Compensation Agreement. The first paragraph of the document says, With this memorandum, the parties of Dan Ayala, Bob Lovett, and Brent Lovett agreed to the following compensation plan. The vast majority of the document goes into detail about his compensation plan and specifically how his commissions would be calculated. The only place where we have references to an employment contract is in Paragraph 7, which reads in full, Employment Terms. The above-mentioned agreement outlines the new salary and bonus structure to remain in place until $150 million USD is reached. It is not a multi-year commitment or employment contract for either party. The contingency that's identified there, remain in place until $150 million USD is reached, is that sufficient in your view under Minnesota law? Could that be enough to make it an employment contract until a date certain? It's not a date certain, Your Honor, because it's an... Well, it's not a date, but I understand that it's not a date certain, but would under Minnesota law, under some circumstances, would that be sufficient? Your Honor, had the parties said, for example, the above-mentioned agreement outlines the new employment relationship to remain in place until $150 million USD is reached. Had they said something like that, I think, yes, it could have created an employment contract. In fact, the case law does indicate, as the appellant points out, that parties can create a term of employment measured by something other than a term of years. But that's not what happened here. And the district court, frankly, didn't find otherwise. The point is that under Minnesota law, the parties have to alter at-will employment by clear and unequivocal language. So parties could say clearly and unequivocally, we will continue your employment until Katy Perry is elected President of the United States. That's probably never going to happen. But if they clearly and unequivocally said, we're going to guarantee your employment until this thing happens, that would at least be a closer call, Your Honor. But here, these two sentences working together very clearly say what the agreement is, and then they say what it isn't. The clear and unequivocal language is the piece, the first sentence of paragraph 7 that says, the above-mentioned agreement outlines the new salary and bonus structure to remain in place. Couldn't that exact language, while not being a date certain, be a time certain? The time being when $150 million worth of sales were reached? No, I don't believe so, Your Honor, because it's unknown when, if ever, $150 million will reach. The questions earlier as to what if the company decides to cease operations? What if they sell the company? What if they no longer, you know, do bar net sales as this agreement contemplates? Even in looking at what- Under those circumstances, then they need to sit down and reach a subsequent agreement as to closing out the contract that's in force and effect? Well, if they continued to employ him in this position of Executive Vice President of America and General Manager of Latin America, then they would presumably want to work together and need to work together to figure out how are we now going to compensate you. This agreement, contrary to Appellant's position, did have a purpose. It's true that the salary change had already gone through. It's true that the title change had already gone through. But what had not happened was the thing that the two of them really wanted to do with this agreement was put something down so they're not renegotiating his commission. The contract required him to do other things besides work until that time so that if he quit doing the things that were necessary, you could perhaps, through breach of contract otherwise, discharge him or set the contract aside. But as long as he continued to work and do the job that was set forth in the agreement until you reached $150 million, wouldn't that be a time certain subject to the terms and conditions of the contract? I again don't believe so, Your Honor, because I just don't think that the time is certain. They would continue compensating him pursuant to this plan and this commission structure. When they discharged him for some reason, when he wasn't working or something like that, what were the factors there? What actually happened? Why did they discharge him? They discharged him from this executive vice president of America's position due to performance issues. They're outlined briefly in the summary judgment and appellate materials. There was a meeting in Taipei with the parent company in which his behavior was inappropriate and some of the members of the Taiwanese company expressed to Brent Lovett that they had lost confidence in Mr. Ayala to reverse the course of sales. Sales were also down in that year. A lot of appellant's problems in CyberPower's view related to his management of people, and so they thought that they could take him out of this role and move him into something else that would not involve management so much as it would involve maybe more sales-focused role. That's why they wanted to give him a different position, not to get out of a contract that they didn't like,  that they had in fact abided by for about a year and a half. It's untrue that the contract was illusory and had no meaning. The party's conduct demonstrates that it did have a meaning and they did abide by it, but he was let go from that position because he was no longer performing satisfactorily. Then when they tried to offer him this alternative role, he didn't want to do it under the terms that CyberPower wanted to offer it to him. And the reason for, you know, to appellant's argument about why would they then need to sign this other agreement, if it's really just about compensation, why don't they just dictate what compensation is? Within this arrangement that you've described, when was it that he knew that this was not going to be a time certain, that is, the $150 million? Did that have anything to do with the termination of his employment? Whether or when they might reach $150 million was not related to the reason for his termination. You hadn't reached $150 million. Correct, and to date have not reached $150 million in sales. So today, theoretically, he should still be employed if these other conditions had not occurred. Is that what you're saying? That's part of the problem with appellant's argument, I think, Your Honor, is that under the terms of this agreement, as he reads it, he would be employed potentially indefinitely. And Minnesota law actually also says that if you have an agreement for an indefinite period of time, that's construed as at will. So part of this was also addressed in the district court's decision, which among other reasons for saying this is unambiguously not an employment contract, the district court said appellant's proposed construction is absurd because had appellant's construction been adopted, it would mean that if he never grew sales, if he did a really poor job, CyberPower could never terminate his employment unless and until they somehow, despite his efforts, got to $150 million. And that if the intent of contract interpretation is to enforce the intent of the parties, as the district court correctly concluded, that is not something that we can reasonably infer and no fact finder could reasonably find that that was their intent. The e-mails that surround the execution of the compensation agreement underscore that point. In his briefs, appellant talks about just a portion of that language, and again, I encourage the court, I'm sure you have, to read the entire exchange, but appellant quotes only from the parts where just the specific language where Robert Lovett says long employment contract, trying to say that this means he knew they were negotiating and intended to be negotiating an employment contract. But again, the whole language says I have issues signing such a long employment contract, and Mr. Ayala then responded to that concern by including paragraph 7. I'd like to also touch on the fact that if the court were to find this agreement ambiguous, and again, because it specifically says it's not an employment contract, it is not ambiguous, but if the court were to find that it is, in addition to the e-mails, there are a couple of other pieces of parole evidence that would still compel the conclusion that cyber power is entitled to summary judgment. Even if the agreement is ambiguous, summary judgment is still appropriate if no reasonable fact finder, considering all the evidence, could find for appellant's position. So in addition to the e-mails, which are the most compelling evidence of what were the parties intending and thinking about when they executed this document, there are a couple of other things. First, it's significant that appellant provides no evidence of a clear and unequivocal promise to alter at-will employment anywhere in the record. The only thing that he has cited to in the briefs are the conclusory allegations from his amended complaint. That's insufficient as a matter of law at summary judgment. He needs to be able to point to admissible fact-based evidence. And additionally, Your Honors, there is a relocation expense agreement, which is also in cyber power's addendum, but this document was also indisputably drafted by appellant. It was executed by the parties just a few months after the compensation agreement, and this document indicates or has a provision about what would happen if appellant's employment were terminated by July 1st of 2015, which was well before, years, years before anyone anticipated that they would reach $150 million in sales. That agreement contains language drafted by appellant that says, should you be terminated for any reason prior to receiving the full amount, and then describes what would happen in that context. So, again, Your Honors, I am out of time. We respectfully request that the court affirm the district court's decision granting cyber power summary judgment. Thank you. I may please the court three things. First, about drafting the contract. The draft Mr. Ayala sent included a memorandum summarizing discussions between the parties, indicating that the terms had been raised by Mr. Lovett, then memorialized by Mr. Ayala, exchanged, and the final term added significantly, paragraph 7, introduced a term not before seen in the contract, that being that what paragraph 7 was defining was employment terms. And I would suggest this is not merely a compensation agreement if the parties at the last moment added provision thus titled. Second, as to the Caveira case, Ms. Conway says this contract would have been enforceable and abrogated at will employment had it said it lasted until Katy Perry becomes president. The conditions subsequent in the contract is much more realistic than that. And under Caveira, you can abrogate at will employment without saying you need to do so. All you need to do is have a contract saying there's a defined future point. Here are the employment terms between now and then. And that is exactly what the parties did. Counsel, we appreciate your arguments today. The case will be submitted and decided in due course. That completes our argument calendar for today.